Moncure, J.,
after stating the case, proceeded :
I will first consider the case of Mosby’s adm’r, &c. v. Mosby’s adm’r, which is the appeal from the decree of August 1841.
The main question in this as well as the other case, is as to the liability of Miller, as sheriff and committee administrator, for the rents of the Buckingham land received by his deputies, Thomas and Richard Watkins. Before that question is decided, it will be necessary or convenient to consider:
First. Whether the executors, before the death of one and the revocation of the authority of the other, *590 were not authorized as such to receive the rents of the said land, and accountable therefor to the appellants as residuary devisees and legatees under the 5th clause of the will ? That clause gives express and absolute power to the executors as such to sell the land. The words of it are, “ Whenever my executors think best, they shall sell my land in Buckingham county, together with all the personal estate thereto belonging, except,” &c. There could have been no doubt, therefore, as to their liability for the proceeds of a sale of the land, if one had been made by them. But what were their powers and liabilities in regard to the rent of the land in the mean time, is the -question now to be considered: And that question depends upon whether the power given to the executors by the will was a naked power to sell, or was what is called in law a power coupled with an interest. “ Where the devise is merely a power to the executor to sell, there the heir may enter and take the profits until the executors have sold; and after the sale the purchaser may enter on the heir.” But where the power is coupled with an interest in the land, “ -the heir cannot intermeddle with it; and the executors, after -the death of the devisor, may enter into the land and take the profits and make sale according to the devise ; because the devise takes away the descent, and vests the estate of the land in -the executor.” 1 Lomax on Executors 219.
Many nice and refined distinctions have been taken between forms of devise which have the effect of conferring a -naked power, and those which have the effect of -conferring a power coupled with an interest. The ordinary forms of devise are : 1. “ I devise my land to my executors to sell;” or, 2. “I devise my land to be sold by my executors;” or, 3. “I devise that my -executors shall sell my land,” or “that my land shall be sold by my executors, which is the same thing. The *591 first form of devise has been conceded by all to have the effect of giving an interest in the land. Lord Coke thought that the 2d form had the same effect. And Lord Hale and Hargrave thought the 3d form had also the same effect. But Sugden has clearly shown by authority, that the opinions of Hale and Hargrave, and even of Coke, are unfounded; and that all of the above forms, except the first, are appropriate to confer a power only, and not an interest also. See Sugden on Powers, chap. 3, § 1, p. 128-152.
The form of the devise in this case is, “ that my executors shall sell my land,” &c.; and being the 3d of the above forms, is appropriate for conferring a naked power.
But the question is always one of intention on the whole will; and the mere form of the devise may be controlled by the context. In the language of the Supreme court of the United States in Peter v. Beverly, 10 Peters’ R. 532-564, the courts, (in the American cases at least) have generally applied to the construction of such powers the great and leading principle which applies to the construction of other parts of the will, to ascertain and carry into execution the intention of the testator.” In the case of Osgood v. Franklin, 2 John. Ch. R. 1, the question was whether a sale made by a surviving executor was good; and that question depended upon whether the will conferred on the executors a naked power, or a power coupled with an interest. The form in which the power of sale was conferred in that case, was the 3d of the above forms; and was appropriate for conferring a mere power of sale. But Chancellor Kent, while he acknowledged the rule of the common law, was equally satisfied that the case was not governed by it. In the first place he was of opinion that there was in that case, “ an interest sufficient to feed the power and keep it alive in the hands of the surviving executors. *592 The executors were vested by the will with an absolute interest in an undivided moiety of the whole residuary estate on which the power was to operate; and they were also directed to keep the whole of this residuary estate as much as possible on interest or rents, for the general benefit. This authority to lease, and this interest in the subject itself, must be sufficient to exempt the power from the character of a mere naked authority to a stranger. It is not necessary that the interest coupled with the power, should be a legal interest. An equitable estate is sufficient, and is regarded in this court as the real interest •; nor does the^character of the power depend on the quantity of interest.” In the next place he was of opinion that there was “ a trust charged on the executors, in the direction given to them to distribute the proceeds of the residuary estate: And according to the settled doctrine of the court, the trust does not become extinct by the death of the trustees. It will be continued in the survivor and cannot be permitted in any event to fail of execution for want of a trustee.” Either of these grounds he considered sufficient to support the sale made by the surviving executor, and he therefore decided it to be a good sale.
The case of Franklin v. Osgood was carried to the Court of errors, where the decision of chancellor Kent was affirmed by a large majority of the court. 14 John. R. 527. Indeed it does not appear that any of the court dissented from the principles of construction laid down by the chancellor. The minority differed from the majority in regard to what was the intention of the testator, according to the ordinary rules of construction applied to his will. Platt, J. who delivered the opinion of the majority, said, “ There is also another class of cases which clearly show that where the terms made use of in creating the power, detached from the other parts of the will, confer merely a naked *593 power to sell, yet the other provisions of the will evince a design in the testator that at all events the lands are to be sold in order to satisfy the whole intent of the will, then also the power survives. In this latter case, it is not a naked power, in the sense of Lord Coke’s general rule, but is coupled with other trusts and duties which require the execution of the power to sell.” And although if the testator had used merely the words of the section by which the power of sale was given in that case, without any qualifying ivords or dependent provisions in the will, he would have had no doubt that the authority ought to be construed strictly; yet, looking at the whole will, and construing this section in connection with others, and in reference to all the provisions of that instrument, his mind was irresistibly led to the conclusion that it best accorded with the intention of the testator that the power should survive to the only remaining executor. See also the cases of Jackson v. Ferris, 15 John. R. 346; and Lessee of Zebach v. Smith, 3 Binn. R. 69.
In the case of Peter v. Beverly, 10 Peters’ R. 532, the Supreme court unanimously approved the same rules of construction. The opinion of the court was delivered by Mr. Justice Thompson, who had delivered the opinion of the minority of the Court of errors in the case of Franklin v. Osgood. And after reviewing the cases, he concludes by expressing a very decided opinion that the power to sell given by the will in that casfe, was a power coupled with an interest, which survived and might be executed by the surviving executor, though the form of words by which the power was given was appropriate for conferring a naked power. The observations of the court iu that case are very applicable to this; but being of the same character with those I have quoted from the case of *594 Franklin v. Osgood, it is unnecessary to notice them any further.
The cases which I have cited are entitled to the greatest consideration, having been very ably argued, and decided by judges of great eminence. The rules of construction announced therein, are reasonable ; and will, I doubt not, be acted on by most, if not all, of our American courts. See 3 Greenleaf’s Cruise on Real Property, vol. 6, p. 361, note 1, where the opinion of Thompson, J. on this subject, in Peter v. Beverly, is cited at length. See also 4 Kent 326. Then the question in this case is, whether, on the principle of the cases cited, the power of sale was a. mere naked power, or a power coupled with an interest? Did the testator intend that his executors should merely have power to sell this land, or that they should also, in the mean time, hold it for the benefit of his residuary devisees? Which construction would be more apt to carry out the manifest object and scheme of the will.
The testator obviously did not design that until a sale of the land it should devolve on his heirs. He intended to break the descent and give the land, with all the other subjects embraced by the residuary clause, to his residuary devisees and legatees from the time of his death. He did not mean to put it in the power of his executors to defer ad libitum the period for the enjoyment of the land by the devisees. His object in giving them a discretion as to the time of selling, was to benefit, and not to. injure, the residuary devisees. In the language of Jarman, in his Treatise on Wills, vol. 1, p. 540, “ it seems hardly supposable that the testator could mean that the-actual enjoyment by the object of his bounty should be liable to be deferred for an indefinite period, by difficulties attending the execution of the trust, or the want of activity in the trustees in effectuating a conversion. To prevent *595 such a consequence, a liberal construction has obtained in these cases, and the legatee, until the execution of the trust, takes an interest in the unconverted property, corresponding to that which he would have been entitled to in the proceeds, if the conversion had taken place.” The residuary devisees, then, were entitled to the rents accruing before the sale of the land. But was it intended that they or his executors should hold possession of the land until the sale? I think that the words and whole scope of the 5th clause of the will show that the executors were intended to have and hold possession of the land from the time of the testator’s death. They were not only to sell the land, but all the personal estate thereto belonging, except the slaves, and sell both at the same time ; that is, whenever they might think best: And the money arising from the sale, together with all other moneys remaining in their hands, (after the payment of debts and legacies,) and three-fourths of his slaves belonging to said plantation, and any estate or property he may have failed to mention, were to be equally divided between his three residuary devisees. He did not expect the devisees to hold any of the property jointly, but intended that all of it should he divided, and they should receive their several portions. The land he intended should be divided, not in kind, (which would probably have been inconvenient,) but by a sale and division of the proceeds: And though he gave his executors a discretion as to the time of sale, yet he doubtless expected the sale to be made in a short time, perhaps one or two years after his death, and before a division was made of the other property. He certainly intended that his executors should have immediate possession of the slaves and other personal estate belonging to the land; and why not the land itself ? especially when the personal estate, except the slaves, was to be sold together, or at the same time, with the *596 land ? Conld he have intended that one hand should hold the land, and another the personal property belonging to the land? He seems to have contemplated, as a matter of course, that his executors would hold all; and he therefore uses the general language, “ Whenever my executors think best they shall sell,” &c. He certainly intended that his executors should take immediate possession of all the Buckingham land; for he directs them to lay oif 350 acres of it as they might think proper, so as to include the dwelling-house ; and he expressly directs them to hold that part of the land, and certain slaves, in trust for the benefit of his daughter Mrs. Binford during her life. He gave no direction in regard to the holding of the other part of the land- in trust, because he expected it to be shortly sold. I think it is difficult to read the will without being satisfied that the testator intended, 1st, that his heirs at law should have no interest in the land devised by the 5th clause of his will; 2dly, that his three residuary devisees should be exclusively interested therein, (except the 150 acres;) 3dly, that his executors should take immediate possession thereof, and sell it in a reasonable time thereafter; and dthly, that they should hold it in the mean time, of course for the benefit of the residuary devisees. It follows that the executors were authorized as such to receive the rents of the land, and accountable therefor to the residuary devisees.
It also appears from the cases of Franklin v. Osgood, Jackson v. Ferris, and Peter v. Beverly, before cited, that two of the executors in this case, being also residuary devisees, (one of them in his own right and the other in right of his wife,) they had a sufficient interest in the land to feed the power of sale, and make it a power coupled with an interest.
Secondly. One of the executors having died, and the authority of the other having been revoked, before *597 the land was sold, was the administrator cle bonis non with the will annexed authorized to receive, and accountable for, the rents which thereafter accrued ?
At common law, the proceeds of land directed by will to be sold, were not in any case a testamentary subject. If the executors were authorized by the will to make the sale, they acted in relation to that subject only as trustees. In the language of Green, J., in Jones v. Hobson, 2 Rand. 483-499, “ It was a trust superadded to the office of executor and not inseparable from it. For even if they refused the administration and to be executors, they might still execute the will in relation to the lands; and if there were more than one executor, and one refused and the other proved the will, they must both join in the execution of the trust.” If one refused to join, it was necessary for the parties interested to resort to a court of equity for relief. To obviate this inconvenience the statute 21 Hen. 8, c. 4, was enacted; which in effect provided that where lands are willed to be sold by executors, and part of them refuse to be executors, and to accept the administration of the will, all sales by the executors that accept such administration, shall be as valid as if all had joined. The provision will be found at length in 2 Wms. on Ex’ors 623. This statute was in force in Virginia until 1785; when it was enacted that “the sale and conveyance of lands devised to be sold, shall be made by the executors or such of them as shall undertake the execution of the will, if no other person be thereby appointed for that purpose; or if the person so appointed shall refuse to perform the trust, or shall die before he has completed it.” 12 Hen. St. 150, § 52. This was re-enacted in 1792, with this additional provision: “ but if none of the executors named in such will shall qualify, or, after they have qualified, shall die before the sale and conveyance of such lands, then, in these cases, the sale *598 and conveyance thereof shall be made by such person or persons to whom administration of the testator’s estate with the will annexed shall be granted.” Rev. Code of 1803, p. 166, § 45; 1 Rev. Code of 1819, p. 388, § 52. And thus stood the law from that time until after the period during which the transactions in this controversy arose. The object of our statute was to extend the policy of the statute of Hen. 8; and to render a resort to a court of chancery for the appointment of a trustee unnecessary, by authorizing the duly qualified personal representative of a testator to sell and convey land devised to be sold, unless some other person was appointed in the will for that purpose, and was willing to perform the trust, and completed it in his lifetime. It was considered by the legislature that he who had the execution of the will in regard to the personal estate, should have it also in regard to the real, .in the absence of any direction in the will to the contrary; and would be a fit person for the purpose, whether nominated executor by the will or appointed administrator with the will annexed, by the court of .probat. This I think is the true view of the statute ; and though it is imperfectly penned, and does not reach by its letter some of the cases coming within its spirit, it ought to be construed according to its spirit. The statute does not reach by its letter the case under consideration. It authorizes an administrator with the will annexed to sell and convey, if none of the executors shall qualify or after they have qualified they shall die before the sale and conveyance. Whereas, in this case, the executors qualified, and one only died, the other having been removed from his office before the sale. But nothing can be clearer than that this case is within the meaning and spirit of the statute. The nomination of the executor is not sufficient; he must qualify. For the same reason his qualification ought to continue until after the sale. The revocation *599 of his authority places him in the same situation he would have been in if he had never qualified; or is the same thing in effect, as if he had died before the sale. Why should there be any more necessity for resorting to a court of equity to appoint a trustee in one case than in the other ? Why would not the administrator with the will annexed be as fit a trustee in the one ease as the other? The stat. of 27 Hen. 8 has received a liberal construction. Upon it Lord Coke observes, that although the letter of it extend only to cases where executors have a power to sell, yet being a beneficial law, it is by construction extended to cases where lands are devised to executors to be sold. Coke Litt. 113, a; 2 Wms. on Ex’ors 624. For various instances in which our statute would probably receive a liberal construction, see 1 Lomax on Ex’ors 364—7, § 18, 21, 22. See also, Brown v. Armistead, 6 Rand. 594. That the legislature passed an act in 1840, (Acts of ’39-’40 p. 49,) expressly declaring that if an executor, by reason of his removal from office or from any other cause, be disqualified to make sale and conveyance of lands devised to be sold, the same shall be made by the administrator with the will' annexed, does not show that the former statute did not, by its spirit, embrace the same cases' for whieh that act was intended to provide. The former statute had not been judicially construed to embrace the case provided for by the latter; which was therefore passed out of abundant caution. The stat. 1 Rev. Code 389, § 58, declaring that an administrator should not be compelled to make distribution without a refunding bond had been extended by judicial construction to executors. Sheppard’s ex’or v. Starke, 3 Munf. 29-41; and yet by the act of 1823, the case of executors was expressly provided for. That a discretion is given to the executors in this case to sell, “whenever they might thinkgbest,” is not inconsistent with the power of the *600 administrator with the will annexed to make the sale : Brown v. Armistead, 6 Rand. 594, is decisive upon that subject.
I therefore think the administrator with the will annexed was authorized to sell and convey the land; and being authorized to do that, he was authorized to hold the land and receive the rents and profits until the sale. The will created but one trust in regard to the land, which I have endeavored to show was a trust, not only to sell it, but in the mean time to rent it out and receive the rents. This entire trust devolved on the executors during the existence of their authority ; and must, if any part of it, devolve on the administrator with the will annexed, not having been completed by the executors, and their authority having ceased. The statute never contemplated a division of the trust, and an apportionment of it between the administrator with the will annexed and a trustee appointed by a court of chancery. While it was intended to save parties from the delay and expense of resorting to a court of chancery for the appointment of a trustee to sell the land, it could not have been intended to subject them to the same delay and expense for the purpose of obtaining the appointment of a trustee to hold the land and receive the rents until the sale. The statute having expressly conferred on the administrator with the will annexed the principal power to sell and convey embraced in the trust created by the will, the power to hold and rent out the land in the mean time embraced in the same trust, would seem to pass as a mere incident to the former.
If what has been said is well founded, the plain result is that Miller is liable as sheriff and committee administrator for the rents of the Buckingham land received by his deputies Thomas and Richard Watkins.
The statute of 1819, which governs this case, expressly declares that a sheriff to whom an estate is *601 committed for administration, shall be, to all intents and purposes, the administrator, &c. and be entitled to all the rights, and bound to perform all the duties of - such administrator. 1 Rev. Code 391, § 67. That such sheriff is bound to complete the administration of his decedent’s estate, notwithstanding the expiration of his office before such completion; that he may administer the estate by deputy, and as well after as before such expiration; that he is responsible for the acts and-defaults of his deputy in the administration, and that such responsibility extends to the fund arising from the real as well as the personal estate, are propositions-which have been well settled by this court in Cocke v. Harrison, 3 Rand. 494; Dabney’s adm’r v. Smith’s legatees, 5 Leigh 13; and Douglass v. Stump, Id. 392. The two last were cases which arose under the statute of 1792, Rev. Code of 1803, p. 167, § 61; under which-the-sheriff was not “to all intents and purposes the administrator,” but administered the estate under the-direction of the court, and on different principles from, those which governed an ordinary administration. It may be remarked here, that the statute of 1792 tends-to show that the legislature contemplated and intended, as a general rule that the administrator with the will' annexed should sell land directed by will to be sold-It provided that the court should order the sheriff to. take the estate into his possession, and sell so- much as-the payment of debts should make necessary, or as-should be perishable, or be directed by will to be sold ¿ and declared all sales and conveyances bona fide made by the sheriff or his deputies, or other officer, in consequence of such order, should be as effectual to the purchasers as if they had been made by the decedent in his lifetime. By the succeeding section -“alisales and conveyances of lands theretofore bona fide made by a sheriff or other officer, under any order of court where the lands had been devised to be sold, and the *602 executor had refused to act, were thereby confirmed anc^ m&de effectual against all persons claiming under testator.” See what is said in regard to the construction of this statute in Douglass v. Stump, 5 Leigh 392. The statute of 1819 uses the same language with that of 1792, in providing that the court shall order the sheriff to take the estate into his possession; ^.]ien ar0pping the language of that statute, it proceeds to declare that such sheriff shall thereupon be to all intents and purposes the administrator, &c. The section confirming sales and conveyances of lands before made by a sheriff, was retained in the statute of 1819. The legislature hardly intended by the alteration made by the statute of 1819, to diminish the authority of the sheriff in regard to the sale of land directed by will to be sold; but doubtless supposed that such authority would be fully preserved by the declaration that the sheriff should, to all intents and purposes, be administrator with the will annexed. Both statutes authorized the court to order the sheriff to take the estate into his possession. The word estate in the former statute clearly embraced the real estate directed by will to be sold; and the same word in the latter statute was no doubt intended to have the same meaning. See 1 Lomax on Ex’ors, p. 367, § 23.
There is another principle on which I think Miller is liable for the rents received by his deputies: And that is that a sheriff is liable civiliter, though not criminaliter, for all the acts of his deputies, colore oficii. The doctrine applicable to the ordinary relation of principal and agent, or master and servant, renders the principal or master liable for the misfeasances and negligences of his agent or servant, in all cases within the scope of the agency or employment. Story on Agency, § 308. The former is not liable for the torts or negligences of the latter in any matters beyond the agency or employment, unless he has expressly autho *603 rized them to be done, or subsequently adopted them for his own use and benefit. Hence it is, that the former is never liable for the unauthorized, willful or malicious act or trespass of the latter. Id. § 456. And even in cases within the scope of the agency or employment, though the agent or servant may be a trespasser, and liable in an action of trespass, the principal or master is not; but is liable only in an action on the case for the damage consequential from his employing an unskillful or negligent agent or servant. McManus v. Crickett, 1 East’s R. 106. But on principles of public policy, the liability of a sheriff for his deputy is much more extensive. The acts and defaults of the deputy, colore officii, are considered in law as the acts and defaults of the sheriff, who is liable therefor in the same form of action as if they had been actually committed by himself. He cannot be imprisoned or indicted, but may be fined for the conduct of his deputy. Woodgate v. Knatchbull, 2 T. R. 156. In Saunderson v. Baker, 3 Wils. R. 309, it was decided by the court of common pleas as long ago as 1772, that trespass vi et armis, lies against a sheriff for the act of his bailiff in taking the goods of A. instead of the goods of B. under a fi-fa. Blackstone, justice, “thought the sheriff was answerable in an action of trespass vi et armis for the act of his officer, the law looking upon the sheriff and all his officers as one person; he is to look to his officers that they do their duty ; for if they transgress, he is answerable to the party injured by such transgression, and his officers are answerable over to him. There is a difference between master and servant; but a sheriff and all his officers are considered in cases like this, as one person.” The principle thus laid down by Blackstone, has been approved and followed in the subsequent English cases. Crowder v. Long, 15 Eng. C. L. R. 309 ; Smart v. Hutton, 28 Id. 367; Raphael v. Goodman, 35 Id. 455. In Smart v. Hutton, the sheriff’s *604 officer arrested a defendant under a fi. fa. and carried him to jail, where he remained about 20 days. Trespass for assault and false imprisonment was brought against the sheriff. His counsel argued that “there must be some limit to the doctrine that the sheriff is in all casés to be identified with his officer. The officer in this case acted entirely without authority from the sheriff, and with the grossest ignorance.” But the Court of king’s bench unanimously decided that the action was sustainable. The same principle has been approved and followed in Massachusetts. Campbell v. Phelps, 17 Mass. R. 246; Knowlton v. Bartlett, 1 Pick. R. 271. Also in New York, Walden v. Davison, 15 Wend. R. 575. In the case in 1 Pickering, the court said: “If the act from which the injury resulted was an official act, the authorities are clear that the sheriff is answerable; if it was not an official but a personal act, it is equally clear that he is not answerable. But an official act does not mean what-the deputy might lawfully do in the execution of his office; if so, no action would ever lie against the sheriff for the misconduct of his deputy. It means, therefore, whatever is done under color, or by virtue of his office.” In this case “ there is no doubt that he professed to act as an officer, and that he made the plaintiff believe that he was so acting.” The same in substance, is said in the case in 15 Wendell. But the principle has no where been more fully sanctioned than in our own state. White v. Johnson, 1 Wash. 159 ; James v. McCubbin, 2 Call 273; Moore’s adm’r v. Dawney, 3 Hen. and Munf. 127. In James v. McCubbin, á deputy drove one man’s property on the land of another, in order that he might levy a distress warrant on it; which he accordingly did. Trespass vi et armis was brought against the sheriff therefor, and was unanimously sustained by the court. Certainly no act of the deputy could have been more willful or unau *605 thorized than this. But it was done by color of his office, and the sheriff was therefore held liable. In Moore’s adm’r v. Dawney, as in Saunderson v. Baker, and Campbell v. Phelps, before cited, one man’s property had been taken under an execution against another, and the sheriff was held responsible in trespass. It may be proper to notice the case of the United States v. Moore’s adm’r, 2 Brock. R. 318, which might seem to be opposed to the principle. But the receipt of the money by the deputy marshal in that case, being on the service of the original process and not under execution, was without color, and probably without pretence of authority, and he could only have acted in receiving it, as the agent of the defendant.
Now let us see if this well settled principle be not applicable to, and decisive of, the question under consideration.
By an order of the County court of Powhatan, the authority of Benjamin Mosby as executor was revoked, and he was directed forthwith to deliver the unadministered estate of the testator into the hands of Thomas Miller, sheriff of Powhatan county, for administration ; and the said sheriff was directed to take the said estate into his possession and administer the same according to law and the will of said testator. In obedience to this order Benjamin Mosby delivered the unadministered estate, including the land, to Thomas Watkins, the principal deputy, who, a few months thereafter, to wit, on the 20th of December 1824, publicly sold the perishable property, and rented and hired out the land and slaves for the ensuing year; and continued to rent and hire them out until his death in 1827, when Bichard Watkins, another deputy of said Miller, took possession of said land and slaves, and continued to rent and hire them out, and received the rents and hires during the years 1828, 1829, 1830 and, 1831, and until the authority of said Miller was re *606 voked and administration was granted to said Benjamin Mosby, who then came again into the possession of said land and slaves. A list of sales, rents and hires of the said estate, while it was in the hands of said Thomas Watkins, was made out in his handwriting; and a list of rents and hires of the estate, while in the hands of the said Bichard, was made out in his handwriting. In the account which was settled in this case of the administration of said Miller on the said estate, the estate was credited with the rents, and charged with the taxes, which annually accrued on the land, and no objection was made thereto by him; but on the contrary, he, in effect, admitted the propriety thereof by desiring that the account should be taken separately as to the said two deputies, so as to show what each was accountable for to him. An administration account had been previously settled before commissioners in the county in which the same credits and charges of rents and taxes were doubtless made; though that account is not a part of the record, but is merely referred to therein.
These facts conclusively show that Thomas and Bichard Watkins took possession of the land, rented it out, and received the rents, under color of their office of deputy sheriff; and, whether they were authorized as deputies to do so or not, their principal is, I think, clearly bound for the rents according to the principle and the authorities before stated. Suppose, under the order to take possession of the unadministered estate, they had taken possession of the slave of a stranger and hired it out as part of that estate; would not their principal have been liable for the hires received by them to the owner of the slave? That would in all respects have been like the case of one man’s property being taken under an execution against another; in which the sheriff has, over and over again, been held responsible for the act of his *607 deputy. What difference can it make if, instead of taking and hiring out the slave, they have taken and rented out the land of a stranger, will not the sheriff ■ be as much bound for rent in the one case as he would be for hire in the other ? If the deputies in taking possession of the land had acted not only without authority, but with the grossest ignorance of their powers and duties, the sheriff would have been liable according to the case of Smart v. Hutton, before cited. Or if, even in so doing-, they had knowingly violated their duty and committed a willful trespass, he would have been liable, according to the case of James v. McCubbin, before cited. A fortiori, he is liable in this case, in which, if the deputies were not authorized by law to take possession of the land and rent it out, they at least acted bona fide in so doing, and all parties concerned, including even the court that decided the case, as at first advised, seem to have been under the impression that they were so authorized.
But whether I be right or wrong in the views I have already taken of the case, was not the final decree of the 2d of November 1837 conclusive against the sheriff? And was not the decree of the 8th of November 1842 on the bill of review erroneous in setting the former aside ? The original bill charged that the sheriff or his deputies had received the rents, &c. and that the sheriff was accountable therefor to the complainants. The answer of the sheriff admitted that the rents, &c. had been received by his deputies, and did not deny his accountability therefor; but on the contrary stated that he had no objection to a settlement of the administration account, and desired that the commissioner should be directed so to state the account as to show the amount of rent, &c. received by each of his deputies. The rents were accordingly included in the account, and no exception being taken to the commissioner’s report, the same was confirmed, and a *608 fiual decree rendered thereon. Certainly the report could not for the first time be objected to in this court on the ground that the rents were included in the account. “ Reports which are erroneous upon the face of them, although not specially excepted to prior to the hearing, may perhaps be objected to at the hearing or in the appellate court.. But it is clear that reports not excepted to cannot be impeached before an appellate court in relation to matters which may be affected by extraneous testimony.” 2 Rob. Pr. 383, citing White’s ex’ors v. Johnson, 2 Munf. 285, and other cases. In the case of Foreman v. Murray, 7 Leigh 412, which was a suit by a ward against a guardian for a settlement of the guardianship account, the bill insisted that the guardian should be charged with interest which he had not actually received, and the guardian, by his answer, contested the charge; but he filed no exception to the account reported by the commissioner, which made the charge of interest, and was the foundation of the decree against the guardian. It was held to be too late in the appellate court to object to the decree on this ground, Row if the sheriff be not liable for the rents received by his deputies in this case on the ground that they were authorized to receive them virtute officii, nor even upon the ground that they received them colore officii; yet I think there can be no doubt of his liability if they received them by his authority, express or implied. If the record does not itself show that the rents were received by the deputies by authority of the sheriff, the fact may have been shown to the satisfaction of the commissioner by extraneous testimony ; and, on an appeal from the decree upon the report without exception, would be presumed to have been so shown. The same principle applies to a bill of review for error apparent on the face of the decree j of which nature was the bill of review in this case. And I can conceive of no reason which would autho *609 rize the presumption in the one case and not in' the other.
I am therefore for reversing the decree of the 8th of ■ November 1842, with costs, and dismissing the bill of review with costs.
I will now consider the case of Miller v. Jones, &c., which is the appeal from the judgment in the action at law brought by the sheriff against the surviving obligors in the bond of his deputy Thomas Watkins.
The error assigned by the appellant is, that the court instructed the jury that the plaintiff in the action, as administrator aforesaid, was bound to rent out the land, but is not in law liable to the devisees for the rents, and had no right to recover them from the defendants in the action.
I have already endeavored to show not only that the plaintiff was bound to rent out the land, but that, whether so bound or not, he is liable to the devisees for the rents received by his deputies. It now only remains to be considered (at least in regard to the above assignment of error) whether the defendants are liable over to the plaintiff for the said rents which have been recovered of him by said devisees ?
That the deputies themselves or their representatives are liable over to the plaintiff for the rents received by them respectively, will not, I suppose, be disputed ; and the only question then is, whether the sureties in the bond are liable ? Thomas Watkins farmed the office of sheriff from Miller for the two years of his sheriffalty; and was, by himself or his assistant deputies, to perform all the duties of the office of sheriff during that period; and was to give to Miller, at each period of his qualification as sheriff and of said Thomas’ qualification as deputy, a bond with such security as Miller might approve, and in a penalty equal to the whole penalties of the bonds required of Miller as sheriff, conditioned for the faithful *610 discharge of all the duties of sheriff during the continuance of said Miller in office, and for his indemnity against all losses or damages which he might sustain ‘ or be liable for in consequence of any failure or misconduct of said Thomas as deputy, or of any other person who might be employed by said Thomas at any time to assist him in the execution of the duties aforesaid. Thomas and Richard Watkins qualified as deputies for each year of the sheriffalty; the latter having qualified at the instance of and to assist the former as aforesaid. The bond on which the action was brought was the bond of said Thomas and his sureties for the first year of the sheriffalty, and conforms to his agreement with the sheriff aforesaid, both as to penalty and condition; and contains, besides, similar specific conditions to those which were contained in the three official bonds of the sheriff. The estate of Littleberry Mosby was committed to the said sheriff for administration during the first year of his sheriffalty, and while said Thomas and Richard were his deputies, to wit, on the 21st of August 1824. It became then the duty of the sheriff to complete the administration, whether before or after the termination of his office! Thomas Watkins having farmed the office for that year, he and his assistants were bound to perform that duty. And the bond being expressly conditioned for the faithful discharge of all the duties of the office, and for the indemnity of the sheriff as aforesaid, the liability of the obligors, as well sureties as principal, to the sheriff for the rents received by his deputies and recovered of him as aforesaid, seems to follow as a necessary consequence.
But it is argued by the counsel for the appellees that as the estate was committed to the sheriff for administration prior to the act of February 16, 1825, Sup. Rev. Code 215, the sureties of the executors would not have been responsible for rents received by *611 the latter; and that the sureties of the sheriff or his deputies are therefore not responsible for the rents received by them. I think this is a non sequitur. The sureties of the executors would not have been bound, because the condition of executorial bonds did not extend to land devised to be sold until after the passage of that act. And it was determined by this court, in Jones v. Hobson, 2 Rand. 488, which was decided in 1824, just before the passage of the act, “ that the proceeds of land devised to be sold are not, and never were, a testamentary subject; that executors hold such proceeds not in their character of executors, but as trustees; that the literal terms of the executor’s oath and bond bind him only in relation to the goods, chattels and credits of his testator; that there is nothing in our legislation on this subject which indicates an intention that the obligation should have a greater extent, but the contrary; and that the sureties of an executor are not responsible for the proceeds of lands sold by him.” Prior to that decision the general understanding of the country was probably otherwise; and in a few months thereafter the act of February 1825 was passed. But the condition of the bond of the deputy and his sureties, on which the action was brought in this case, is for the faithful performance of all the duties of the office, and for the indemnity of the sheriff' against all losses or damages which he might sustain or be liable for, in consequence of any failure or misconduct of the said deputy or any of his assistants. Therefore, if it was, as I have endeavored to show, the official duty of the sheriff to rent out the land until the sale ; or even if the rents were received by the deputies colore officii, though without legal authority, and the sheriff, as I have also endeavored to show, was on that ground liable therefor to the devisees, it follows necessarily that the obligors in the said bond are bound thereby to the sheriff for the rents *612 which have been recovered against him by the devisees- Tliere is nothing in Jones v. Hobson, 2 Rand. 488, nor in Boyd’s ex’ors v. Boyd’s heirs, 3 Gratt. 113, which can affect this case, in my view of it; for, according to that view, it is a matter of indifference whether the land be regarded as a testamentary or as a trust subject; or whether the sheriff, in relation thereto, be regarded as an administrator with the will annexed, or as a trustee. In either case the obligors in the bond are liable. See Douglass’ ex’or v. Stump, 5 Leigh 392. I cannot conceive on what ground their liability can be denied, if it be admitted, as I think has been established, that the duty of collecting these rents devolved upon the sheriff, that he had a right to perform this duty by deputy, and that for the default of his deputy in respect thereto he is responsible. Why should he not be indemnified against the consequences- of that, as well as any other official default of his deputy? He might, and in common prudence ought to have required such indemnity. Whether it was given or not, must be determined by a reference to the bond of the dejiuty; and on referring to that we see that it uses the broadest possible language, and provides for indemnity against every official default whatever.
Surely it cannot, with any plausibility be argued, that the legislature in declaring that the sheriff (to whom an estate is committed for administration,) “ without being required to give any other bond or security than he may have already given, or to take any other oath of office than he hath before taken, shall be to all intents and purposes the administrator,” &c. intended to impose any limitation on the broad terms of the sheriff’s bond in regard to the administration of estates, and confine them to those subjects to which the narrower terms of executorial and administration bonds extended. Such a construction would be forced *613 and unreasonable. The legislature intended to make these new administration duties, whether in regard to real or personal estate, a part of the duties of the office of sheriff, the performance of which is secured by his official bond and oath ; and therefore when these new duties were imposed by law upon the sheriff, it was declared that no other than his official bond and oath were necessary; and when, in consequence of the decision of Jones v. Hobson, the form of executorial and administration bonds was so changed by law as to extend to real estate devised to be sold, no corresponding change was made in the form of the sheriff’s bond, which was already sufficiently extensive. But even if there were any doubt as to the obligation of the sheriff’s bond in this respect, there could be none as to that of the deputy’s bond, which, besides containing similar conditions to those of the former, contains a condition for the complete indemnity of the sheriff.
If I be right in what I have said, the Circuit court erred in giving the instruction aforesaid. But I doubt whether it would have been right to have given the precise instruction asked for by the plaintiff! In considering the propriety of the instruction which was given I have assumed as true facts which the evidence tended to prove, but the decision of which belonged to the jury. It was proper to do this for the purpose of testing the correctness of the instruction. One of the facts so assumed is that “ Bichard Watkins was employed by the said Thomas Watkins to assist him in the execution of his duties as deputy sheriff aforesaid within the county of Powhatan.” The instruction as asked for, seems to be based upon the same assumption, though the evidence offered to prove the fact was partly oral. Whereas I think the fact should be stated hypothetically in the instruction, as “ if the jury shall believe from the evidence that Bichard Watkins,” &c. as above. With this addition the instructions asked for might have been given.
*614 On the trial of the action seven bills of exceptions were taken by the defendants to opinions of the court overruling motions made by them. And they now complain that the said opinions were erroneous, and pray that the judgment may be reversed with costs to them. I am clearly of opinion that there is no error in any of these opinions, but deem it unnecessary to comment on them in detail as the correctness of most if not all of them is sufficiently shown by what I have already said.
I am therefore for reversing the judgment with costs, setting aside the verdict and remanding the cause for a new trial, with directions not to give: the instruction to which the plaintiff excepted on the former trial; but, if required, to give the instruction then asked for by him, with the addition before mentioned.
Lee, J. concurred in the results of the opinion of Moncure, J.
The other judges concurred in the opinion.
Decree and judgment according to the opinion.